# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 4, 2019

Lyle W. Cayce
Clerk

No. 18-10099

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JENNEY DINH, also known as Jenney Thi Dinh,

Defendant – Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and DAVIS and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Jenney Dinh pleaded guilty to distributing a large volume of pills containing Fentanyl analogues. Two crime laboratories tested samples of the pills and reported that every pill tested contained the analogues. At sentencing, the district court used the total weight of all the pills as the attributable drug quantity. On appeal, Dinh objects to the district court's use of that drug quantity when calculating her sentence. Because the district court did not err in using that drug quantity, we AFFIRM.

## I.

Dinh pleaded guilty to being in the illegal opioid business and she is serving a 151-month sentence in prison. As admitted in a factual resume signed pursuant to her plea agreement, she was caught possessing and selling

No. 18-10099

large quantities of pills on four separate occasions.  The pills were advertised as Hydrocodone and Oxycodone; however, lab reports from the first three batches detected that they contained Fentanyl analogues instead.[1]

In the first seizure, a bag containing 991 pills was found during an inventory of Dinh's car after an arrest.  Those pills were sent to a Texas Department of Public Safety crime lab for analysis.  The lab tested a sample of 29 pills from that batch and detected a Fentanyl analogue in every tested pill.  The lab report notes that the bag contained "991 white oblong tablets," and states that "[t]he statistical sampling plan used indicates a 95% confidence that at least 90% of the items will have the reported results."  In the second seizure, Dinh sold an undercover DEA agent 1,001 pills.  Those pills were sent to a DEA lab for analysis.  The lab tested 28 pills from that batch and detected a Fentanyl analogue in every tested pill.  As with the Texas DPS lab report, the DEA lab report does not indicate any way in which the pills were distinguishable from one another and states that the sampling plan represents a 95% level of confidence that at least 90% of the pills contain the analogue.  In the third seizure, Dinh sold an undercover DEA agent 506 pills.  Those pills were again sent to a DEA lab for analysis.  The lab again tested 28 pills from that batch and again detected a Fentanyl analogue in every tested pill.   The lab report again does not indicate any way in which the pills were distinguishable from one another and again states a 95% level of confidence that at least 90% of the pills contain the analogue.

In total, 2,498 pills from three separate batches, with a net weight of 838.9 grams, were sent to the labs.  The labs tested 85 of those pills (28-29 from each batch) and detected Fentanyl analogues in every single pill that was

---

[1] The pills from the fourth batch were not sent to a lab for analysis nor were they factored into her relevant drug quantity at sentencing.

2

No. 18-10099

tested. The lab reports then stated that based on those samplings there was a 95% level of confidence that *at least* 90% of all the pills contained Fentanyl analogues. None of the lab reports go into depth on the chemical equations underlying their results nor the mathematical models underlying their ranges of statistical certainty.

Based on those lab reports, the Presentence Report (PSR) concluded that the relevant drug quantity was the net weight of all the pills submitted for testing—838.9 grams. Dinh objected to the use of that quantity on the grounds that: (1) it violated Due Process to test only a small sample of the pills; (2) it violated Due Process not to ascertain the exact composition of each pill; and (3) it violated the Confrontation Clause not to be able to cross-examine the lab technicians. The district court overruled those objections, and sentenced Dinh to 151 months' imprisonment (the bottom end of a Guidelines range of 151–188 months). Dinh filed a timely notice of appeal, and we have jurisdiction under 18 U.S.C. § 3742(a).

## II.

"We apply the clearly erroneous standard of review to the district court's factual determination regarding the quantity of drugs used to establish the base offense level." *United States v. Alaniz*, 726 F.3d 586, 618 (5th Cir. 2013) (citing *United States v. Johnston*, 127 F.3d 380, 403 (5th Cir. 1997)). "Ultimately, the district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence." *Id.* at 618–19 (citing *United States v. Betancourt*, 422 F.3d 240, 247 (5th Cir. 2005)). "A factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole." *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).

"We review the district court's interpretation and application of the Sentencing Guidelines *de novo*[.]" *United States v. Rodriguez-Lopez*, 756 F.3d

3

No. 18-10099

422, 434 (5th Cir. 2014) (citing *United States v. Miller*, 607 F.3d 144, 147 (5th Cir. 2010)).  "[W]hen faced with a preserved constitutional challenge to the Guidelines' application, our review is *de novo.*"  *United States v. Preciado-Delacruz*, 801 F.3d 508, 511 (5th Cir. 2015).

## III.

On appeal, Dinh argues that the district court's reliance on the PSR's drug quantity was legal error for three reasons: (1) it reflected the mixture weight of the pills rather than just the controlled substance weight; (2) there was no opportunity to confront the lab technicians; and (3) the PSR did not provide an adequate evidentiary basis for extrapolating the drug quantity to include all of the untested pills.  We address each argument in turn.

## A.

Dinh repeats the argument she made before the district court that using mixture weight to calculate the overall drug quantity, rather than the isolated weight of the Fentanyl analogue components, is a Due Process violation.  She asserts that the Sentencing Guideline's direction to calculate Fentanyl analogue quantities in that manner is unconstitutional.  She argues it is absurd and disproportional to sentence two offenders with identical amounts of Fentanyl analogues to dramatically different sentences just because one offender mixes her Fentanyl analogue with sugar (or, in this case, acetaminophen) and the other leaves it pure.  She points out that if she had been selling Hydrocodone and Oxycodone—like she allegedly believed—the quantity would be based on the actual controlled substance weight rather than the mixture weight.

No. 18-10099

However, Dinh's argument is unavailing. Under the 2016 Sentencing Guidelines,[2] the default rule for calculating the weight of a controlled substance is its mixture weight. U.S.S.G. § 2D1.1(c), Note A ("Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."). Fentanyl analogues, unlike Hydrocodone and Oxycodone,[3] are not otherwise specified, so they are subject to the mixture rule. Moreover, the Supreme Court has already held that mixture weight calculations do not violate Due Process when, as here, the drug cannot be easily separated from the mixture and is intended for sale and consumption in the mixture—rejecting the same absurdity and disproportionality arguments that Dinh makes on this appeal. *Chapman v. United States*, 500 U.S. 453 (1991).[4]

B.

Next, Dinh argues that the Sixth Amendment's Confrontation Clause right, as enunciated by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), should be extended to the sentencing phase. Despite whatever intuitive strength such an argument may have, Dinh acknowledges that we already have precedent declining to do so. *See, e.g.*, *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006). Our precedent on this point is in line with

---

[2] Dinh was sentenced under the 2016 Guidelines, so they are referred to throughout this opinion. However, the parties do not brief, nor has the court identified, any way relevant to this case in which newer Guidelines materially differ from the 2016 version.

[3] *See* U.S.S.G. § 2D1.1(c), Note B.

[4] We are troubled by the fact that Dinh's counsel does not attempt to distinguish *Chapman*, nor even acknowledge it as adverse authority which this court should be aware of when considering this argument. Counsel is reminded of his duties, as an officer of the court and member of the legal profession, to exercise due diligence and candor with the court when briefing his clients' arguments.

other circuits. *See, e.g., United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006); *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243–44 (2d Cir. 2005); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85, 128 (2007); *United States v. Brown*, 430 F.3d 942, 944 (8th Cir. 2005); *United States v. Chau*, 426 F.3d 1318, 1323 (11th Cir. 2005). Dinh attempts to distinguish her argument from those that have already been rejected by stating that she is not asking for a general right of confrontation when *any* testimonial evidence is introduced at sentencing, but is instead asking only for a narrow exception when "scientific and technical evidence" is introduced.[5]

But Dinh's argument for an exception in cases dealing with "scientific and technical information" also fails. Dinh does not cite any authority to support her argument that *Crawford* should now be read to recognize a Confrontation Clause right at sentencing for certain types of evidence. Moreover, it has long been established by the Supreme Court that defendants do not have a constitutional right of confrontation or cross-examination at the sentencing phase. *See, e.g., Williams v. Oklahoma*, 358 U.S. 576, 584 (1959); *Williams v. New York*, 337 U.S. 241, 246–51 (1949). As every circuit court to address the question has held, *Crawford* did not address the rights of a defendant at sentencing, so the Supreme Court's precedent in those earlier cases remains binding on this court. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet

---

[5] Dinh does not argue any other basis for her asserted right to cross-examine the lab technicians at sentencing—such as Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). Her argument is limited strictly to the Sixth Amendment's Confrontation Clause right.

No. 18-10099

appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).  Thus, if the Sixth Amendment's Confrontation Clause right were to be recognized as extending to the sentencing phase for all cases, or even some subset of cases involving specified types of evidence, that decision would have to come from the Supreme Court.

C.

Last, Dinh argues that the government needed to present more of an evidentiary basis for how the labs calculated their statistical certainties before the lab reports could constitute a sufficient basis for the PSR (and, by adoption, the district court) to extrapolate the relevant drug quantity.  She asserts that her objection to the PSR ("[t]he burden of proving the accuracy and reliability of these lab reports now rests with the Government") and her objection at sentencing ("[w]e don't know why the chemist is 95 percent confident that this mixture contains the fentanyl analog") were sufficient to require that the government explain how the lab reports calculated their levels of statistical certainty.

In support of her argument, Dinh points to our precedent holding that district courts cannot rely on facts contained in the PSR that are not supported by "an adequate evidentiary basis with sufficient indicia of reliability." *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012); *see also United States v. Elwood*, 999 F.2d 814, 817–18 (5th Cir. 1993) ("Bald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR.").

However, a district court may adopt the facts presented in a PSR "without further inquiry *if* those facts have an adequate evidentiary basis with sufficient indicia of reliability *and* the defendant does not present rebuttal evidence." *Harris*, 702 F.3d at 230 (emphasis added) (citing *United States v.*

*Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)).  Therefore, we must consider: (1) whether the findings of the lab reports in this case provide an adequate evidentiary basis with sufficient indicia of reliability for the PSR to conclude that all of the pills contained Fentanyl analogues; and (2) if they do, whether Dinh offered competent rebuttal evidence requiring the government to further explain the calculation of those test results or how they could serve as the basis for the extrapolated drug quantity.

First, we address whether the lab reports in this case provide an adequate evidentiary basis with sufficient indicia of reliability for the PSR to conclude that all of the pills contained Fentanyl analogues.  We hold that they do.  Contrary to Dinh's argument, the PSR's extrapolation was not a '[b]ald, conclusionary statement[]" with "no support for [its] essential factual determination[]" concerning the quantity of drugs involved.  *Elwood*, 999 F.2d at 817–18.  Instead, the PSR based its conclusion on three lab reports that all stated, with 95% confidence, that *at least* 90% of the seized pills contained Fentanyl analogues.  Those reports were based on random samplings wherein 100% of the pills actually tested were found to contain the analogues.

We have held that district courts "may extrapolate the quantity [of drugs] from any information that has sufficient indicia of reliability to support its probable accuracy[,]" and "may consider estimates of the quantity of drugs for sentencing purposes."  *United States v. Valdez*, 453 F.3d 252, 267 (5th Cir. 2006) (citations omitted).  In that vein, we have held that the results of a lab report are presumptively reliable. *See United States v. Koss*, 812 F.3d 460, 469 (5th Cir. 2016).  We have also held that sentencing courts are permitted to extrapolate the nature and quantity of drugs involved in an offense based on lab reports that tested only a sample of the overall quantity. *See United States v. Rodriguez*, 666 F.3d 944, 947 (5th Cir. 2012); *United States v. Fitzgerald*, 89 F.3d 218, 223 n.5 (5th Cir. 1996).

In this case, two different labs tested samples from three separate batches of pills. From those samples, 100% of the pills that were tested contained Fentanyl analogues. That alone is adequate for establishing a sufficiently reliable evidentiary basis for the extrapolated drug quantity here. In other words, if all the court had before it was those data points, it would not have been clearly erroneous for the district court to find, by a preponderance of the evidence, that the relevant drug quantity included all of the pills. With that said, the lab reports' statistical certainty ranges do nothing to foreclose (and actually bolster) the district court's finding that 100% of the pills contained Fentanyl analogues.

Moreover, this is not a case where a slight adjustment to the attributable quantity would have changed the base offense level. With an attributable quantity of 838.9 grams of Fentanyl analogue, the base offense level under the 2016 Guidelines is 32, which spans from 300 to 1,000 grams. U.S.S.G. § 2D1.1(c)(4). As such, the district court's finding is even less clearly erroneous, as the base offense level would have been the same if only 35.8% of the submitted pill weight contained Fentanyl analogues. *Accord Rodriguez*, 666 F.3d at 947 (noting that the absence of clear error in the district court's extrapolation of drug quantity was "especially true" given that the sentencing guidelines recommended the same base offense level even if the extrapolated drugs had a purity level that was roughly 17% lower than that found in the tested samples).

Simply put, the findings of a lab report are generally considered to have sufficient indicia of reliability for consideration at sentencing without first requiring the government to explain the chemical equations and compounds underlying the results. *See, e.g., Koss*, 812 F.3d at 469. That same presumption of reliability applies to the mathematical models used by the lab to generate the report's range of statistical certainty. As such, there was an

adequate evidentiary basis, with sufficient indicia of reliability, for the district court to find that the drug quantity relevant for sentencing included all of the pills—or at least enough of the pills to reach a base offense level of 32.

Second, we address whether Dinh offered competent rebuttal evidence requiring the government to further explain or defend the lab reports. We hold that she did not. To challenge the validity of the lab reports or the extrapolation of total drug quantity, Dinh could have offered testimony or other evidence that the batches of pills were internally heterogeneous, or that there was some other reason why, under the facts of this case, extrapolation would be inappropriate. In addition, she could have offered expert testimony questioning the scientific accuracy of lab tests for Fentanyl analogues and/or the mathematical modeling behind the statistical certainty range.

However, Dinh has offered no such evidence. She only objected to the lab reports' statistical certainty of 95% and demanded that the government do more to prove the accuracy and reliability of the reports (though she does not specify precisely what that "more" would be). But "[m]ere objections do not suffice as competent rebuttal evidence." *Alaniz*, 726 F.3d at 619 (citing *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998)). *Accord Koss*, 812 F.3d at 470 (rejecting a challenge to lab report findings because, *inter alia*, "[the defendant] did not offer any evidence of flaws in the DPS lab's practices; she did not take the stand at sentencing to explain how she made the [drug mixture] or to clarify the contents of [another drug mixture]; nor did she did call any witnesses to explain the contents of either substance. Absent contrary evidence, we hold that the DPS lab reports . . . were sufficient to support [the sentencing determination] by a preponderance of the evidence[.]").

As such, there was an adequate evidentiary basis in the PSR for the district court to conclude that the relevant drug quantity was the total number of pills, and Dinh did not offer any credible evidence in rebuttal.

No. 18-10099

\* \* \*

Dinh's sentence is AFFIRMED.